**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| DENISE A. ROSALES, individually and on behalf of herself and all others similarly situated,<br><br>   *Plaintiff*,<br><br>v.<br><br>CHRISTINE WORMUTH, *et al.*,<br><br>   *Defendants*. | Civ. Action No. 1:23-cv-00440-DAE |

## PLAINTIFF'S OPPOSED MOTION FOR CLASS CERTIFICATION

### I. STATEMENT OF THE CASE[1]

We owe an immense debt of gratitude to our veterans and servicemembers. But due to bureaucratic illogic, the government has chosen to falsely brand potentially thousands of the people who have served our country as having been "arrested" or "charged" with various crimes when nothing of the sort happened.

Plaintiff, Sergeant Denise Rosales, is just one of the servicemembers who has been shackled with a record falsely stating she was arrested even though she was not. Sgt. Rosales suffered this consequence because the Army uses an FBI-promulgated fingerprint card that contains a "Date of Arrest" field. The Army's policy is that even if a servicemember like Sgt. Rosales was never arrested, the "Date of Arrest" field must still be populated, so the Army uses the date an individual was fingerprinted. After the Army sends the fingerprint card to the FBI, the "Date of Arrest" is used as the basis for creating a false arrest record that is widely circulated.

---

[1] Pursuant to L.R. CV-7(g), counsel for Plaintiff conferred with counsel for Defendants on January 7 and 8, 2025 via email. Defendants oppose this motion.

The Army knows about this problem. Nonetheless, the Army does not tell servicemembers that the FBI will record them as having been arrested even if that is not true; those individuals only find out after they have been denied a job opportunity, security clearance, or firearm purchase. To compound matters, the Army has chosen not to fix any of its processes or policies, let alone correct erroneous records.

Indeed, instead of correcting Sgt. Rosales's false arrest record, the Army sought to dismiss this lawsuit at the outset and stifle discovery into its systemic problem. But the Court acknowledged that Sgt. Rosales pleaded an actionable claim for a procedural due process violation and bafflement with the Army's position: "One could only speculate as to why the Army would defend a record that is not accurate of the events that took place."[2] But here we are. The Army has not—and will not—correct its false records.

Before discovery, the question was: How could this happen? How could the Army mess up the records (and lives) of so many of its current and former soldiers? Discovery revealed the truth—a common and systemic bureaucratic error. The professional careers and lives of thousands of soldiers have been ruined because the Army uses the wrong form when transmitting fingerprint data to the FBI—full stop. That form falsely states the veteran or servicemember was arrested and charged when he or she was not. Now, the Army's large bureaucracy refuses to own up to or fix its error, and because the Army still uses the wrong form, countless more veterans and servicemembers will be falsely branded if the Army bureaucracy is not called to order.

Our veterans and servicemembers deserve better. Left with no recourse after bureaucratic inertia deprived her of the Fifth Amendment's promise of procedural due process, Sgt. Rosales seeks declaratory and injunctive relief on a classwide basis to compel the Army to do the right

---

[2] **Exhibit F1**, ECF No. 77, Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss, at p. 25.

thing—correct her erroneous arrest record and the erroneous arrest records for thousands of soldiers and veterans, a problem that the Army knows is happening "all the time."[3]

## II. BACKGROUND

**A.    Sergeant Rosales is Falsely Branded with an Arrest Record.**

For over a decade, Sgt. Rosales honorably served in the National Guard as a non-commissioned officer. Her military occupation was as an intelligence analyst.[4] Through the National Guard, she worked with the Drug Enforcement Administration, and even graduated from the DEA's Intelligence Research Specialist Course.[5]

From June 2020 to February 2021, Sgt. Rosales was deployed to Kuwait along with her husband. Starting in December 2020, while still overseas, Sgt. Rosales's command investigated her and other soldiers for the alleged presence of alcohol at her husband's birthday party, specifically, whether some water bottles had trace amounts of alcohol. No one alleged that she was intoxicated.

Military Police Investigator Sergeant Ronald Pack interviewed Sgt. Rosales twice regarding the allegations.[6] Following the probable cause finding, Sgt. Rosales provided her fingerprints.[7] Sgt. Pack took her fingerprints using Live Scan software, which generates a digital copy of a document at the heart of this case—the FD-249 "Arrest and Institution Fingerprint Form."[8]

---

[3] **Exhibit A1**, Deposition of Barry Blanset, Jr. ("Blanset Dep."), 65:7.
[4] *See* **Exhibit A6**, Declaration of Denise A. Rosales ("Rosales Dec."), ¶¶ 6 & 9.
[5] *Id.* ¶ 6.
[6] *See* **Exhibit A2**, Deposition of Ronald Pack ("Pack Dep."), 57:12-15.
[7] *Id.* at 55:18-21.
[8] *Id.* at 50:14-21; 54:7-14.

At no point was Sgt. Rosales was ever arrested.[9] She was never taken or received into custody.[10] She was never restricted, confined to quarters, suspended from supervisory or guard duties, or disarmed.[11] She was never arraigned, magistrated, or given an initial appearance in any military or civilian court.[12] Nor was she ever charged with any offense—there are no charging documents. Despite this, in the "Charge/Citation" field, Sgt. Pack did not transcribe an offense with which Sgt. Rosales was charged (she was never charged); rather, he inputted an alleged crime that he thought he could be investigating.[13]

Upon redeployment to the continental United States, Sgt. Rosales reapplied to her position supporting the DEA, believing the application process would go smoothly, as it always had when she had applied for government positions in the past. But she was wrong. In April 2021, Sgt. Rosales was informed of an issue with her DEA application—she had a criminal record. Shocked, Sgt. Rosales inquired into the matter by requesting her criminal history record from the FBI. Upon receiving a copy of the record, Sgt. Rosales discovered that the Army had branded her as having been arrested on a charge of "FALSE OFFICIAL STATEMENTS."[14]

```
1-ARRESTED OR RECEIVED 2021/01/05
    AGENCY-US ARMY QUANTICO (VAUSA1400)
        AGENCY CASE-132-2020-MPI709
```

```
                    - FBI IDENTIFICATION RECORD - FBI UCN-159489VF7
        NAME USED-ROSALES,DENISE ALYSIA
        CHARGE 1-107-B--FALSE OFFICIAL STATEMENTS

RECORD UPDATED 2021/05/03
```

---

[9] Rosales Dec. ¶ 3.
[10] *Id.* ¶ 4
[11] *Id.* ¶ 5
[12] *See id.* ¶¶ 3-5.
[13] Pack Dep., 60:5-6, 8-23.
[14] *See* **Exhibit C2**, Rosales FBI Record (May 3, 2021).

That was false, as she was never arrested or charged, but there was nothing she could do.

The consequences of these false records continued to manifest. Sgt. Rosales not only lost the DEA position she was applying for, she found herself unable to return to full-time active duty.[15] Therefore, Sgt. Rosales is unable to obtain an active-duty retirement.[16]

Unable to return to her previous duties due to the false records, Sgt. Rosales was forced to take a position on the state-funded Operation Lone Star at the southern border and relocated her family closer to the border to be able to participate in the mission.[17] However, even then, the false arrest record prevented her from serving as an intelligence analyst in the National Guard and obtaining access to an arms room where the unit weapons were stored.[18] This false arrest record has ruined her professional career.

**B.    Rosales Retains Counsel to Challenge the False Record.**

Faced with the career-ending consequences of a false arrest record, Sgt. Rosales retained counsel, Doug O'Connell. In November 2021, Sgt. Rosales, through counsel, filed a request to amend her records with the Army under the Privacy Act.[19]

Ultimately, Sgt. Rosales's counsel's efforts to correct the record were futile. The Army denied her request and refused to amend her false arrest record.[20] In its denial, the Army did not even bother to address the merits of her request, instead responding with boilerplate assertions of exemptions that exclude Sgt. Rosales's false records from the reach of the Privacy Act's remedial

---

[15] Rosales Dec. ¶¶ 7-8.
[16] *See id.* ¶¶ 6-7.
[17] *Id.* ¶ 9.
[18] *See id.*
[19] *See* **Exhibit B2**, Privacy Act Amendment Request.
[20] *See* **Exhibit B3**, Privacy Act Request Denial.

provisions.[21] Nonetheless, Sgt. Rosales appealed, **_and over a year later_** the Army denied her appeal.[22]

**C.     The Army Adds _More_ False Information to Rosales's Background Report.**

Having exhausted all available avenues, Sgt. Rosales turned to this Court for relief, filing suit in April 2023.[23] The Army responded to Sgt. Rosales's lawsuit not by correcting the false records, but by _adding_ more falsehoods—two new charges that were not the basis of any judicial or nonjudicial proceedings:[24]

```
COURT- ()
    2021/01/05 DISPOSITION-NOT PROSECUTED
    CHARGE- DSPE/FAIL TO OBEY GENERAL ORDER,MAKING A FALSE
    STATEMENT,OBSTRUCTION OF JUSTICE
    DSPE/NO ACTION TAKEN

RECORD UPDATED 2024/01/05
```

At the same time, the Army admitted in written discovery that Sgt. Rosales was never arrested:[25]

> **REQUEST FOR ADMISSION NO. 1:**
> In 2020 and 2021, Ms. Rosales was never arrested in Kuwait.
>
>      **RESPONSE:** Defendant objects to this request for admission as it calls for a legal conclusion as to the term "arrest." Defendant further objects to this request for admission as vague and ambiguous as to the definition of "arrest" because it depends on an individual's civilian or military status. Subject to and without waiving any of the above objections, Army responds: At this time, Army lacks sufficient information or knowledge to respond to RFA No. 1. In view of that discovery is ongoing, a reasonable inquiry concerning the matter in the particular request has been made, and the information known or readily obtainable is insufficient to enable Army to admit or deny the request at this time. Discovery is on-going and Army will supplement its response as more facts become available.
>
>      **FIRST SUPPLEMENTAL RESPONSE:** Without having waived said objections, admitted.

---

[21] _See id._ (claiming a (j)(2) exemption, among others, which allows for an exemption of a system of records from the Privacy Act).

[22] _See_ **Exhibit B4**, Privacy Act Appeal (dated November 22, 2021); **Exhibit B5**, Privacy Act Appeal Denial (dated December 21, 2022).

[23] _See_ ECF No. 1, Complaint for Declaratory and Injunctive Relief (April 26, 2023).

[24] **Exhibit C1**, Rosales FBI Record (May 3, 2021).

[25] **Exhibit C3**, U.S. Army's First Supplemental Responses to Plaintiff's First Requests for Admissions, Response to Request for Admission No. 1.

But Defendants' admission in litigation was not news to Sgt. Rosales—her unit JAG officer from Kuwait had previously admitted that she was not arrested:[26]

> Sir-
>
> She was not placed under arrest. MPI investigated the incident, not CID,
> though CID may have assisted in taking finger prints.
>
> r/
> Dale
>
> r/
> LTC Dale McFeatters
> Deputy Staff Judge Advocate

All told, Sgt. Rosales is now worse off than she was before. She will have to live with a false arrest record for three false charges, all borne from a bureaucratic disconnect involving the creation and transmission of criminal history information.

**D.    Rosales's Circumstances Resulted from Defendants' Policies and Systemic Failure.**

Sgt. Rosales's experience is representative of the experiences of thousands of Army servicemembers. The reason why is because the Army's policies require military law enforcement personnel to communicate certain criminal history to the FBI—even when that information does not exist.

**1.    DoD Instruction 5505.11.**

In the wake of the Sutherland Springs church shooting in 2017, military investigators discovered that the Air Force had failed to "ensure that [the shooter's] fingerprints and criminal history were submitted to the FBI's Criminal Justice Information Services ('CJIS') Division for inclusion in its databases." *Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL

---

[26] **Exhibit B1**, LTC Dale McFeatters Email, p. 4.

2821125, at *1 (W.D. Tex. July 6, 2021). Had that information been reported, the shooter would not have been able to purchase the firearm used in the mass shooting. *See id.* at *5.

Thereafter, the DoD Inspector General recommended the review of and implementation of programs to enhance the procedures for collection and transmission of criminal history information, including fingerprints, to the FBI's CJIS Division.[27] In typical military fashion, the service branches overcompensated, especially the Army, which recorded a *massive* spike in transmission of fingerprint cards to the FBI between 2017 and 2018.[28]

Transmitting this information is required under DoD Instruction 5505.11, which "prescribes procedures for Army [law enforcement] to report offender criminal history data, by submitting FBI Form FD 249" to the FBI's National Criminal Information System ("NCIS"). 32 C.F.R. § 635.16(a). The Instruction provides that DoD law enforcement will collect servicemembers' fingerprints upon a determination of probable cause to believe that they committed an offense punishable by imprisonment under the Uniform Code of Military Justice or elsewhere in the United States Code.[29] Fingerprints are then collected on the FBI Form FD-249, or its electronic equivalent,[30] and electronically submitted to the FBI.[31]

---

[27] *See* REPORT OF INVESTIGATION INTO THE UNITED STATES AIR FORCE'S FAILURE TO SUBMIT DEVIN KELLEY'S CRIMINAL HISTORY INFORMATION TO THE FEDERAL BUREAU OF INVESTIGATION, Parts VII-VIII, https://media.defense.gov/2018/Dec/07/2002070069/-1/-1/1/DODIG-2019-030_REDACTED.PDF (last visited Jan. 9, 2025). To be clear, Sgt. Rosales is not asserting that Defendants should not report accurate arrest information to the FBI, she merely wants Defendants to stop reporting inaccurate information to the FBI. The government has no interest in maintaining false records.

[28] **Exhibit E1**, Army Fingerprint Submission Quantities.

[29] **Exhibit D4**, DoD Instruction 5505.11, § 1.2.b. Army Regulation 190-45, "Law Enforcement Reporting," implements DoD Instruction 5505.11 for Army law enforcement agencies, including CID and the military police. **Exhibit D5**, ¶ 4-9. **Exhibit D6**, Army Regulation 195-2, "Criminal Investigation Activities," which applies to all U.S. Army CID personnel, also states in paragraph 3-19b that "use of the NCIC will be in accordance with AR 190-45 and the operating instructions of the FBI."

[30] *Id.* § 3.1.a.

[31] *Id.* § 1.2.b.

**2.     The FBI's FD-249 fingerprint card.**

The FBI promulgates the FBI FD-249 fingerprint card, which is used across the government. According to the FBI's own policies, the fingerprint card is meant for arrests or incarceration at a penal institution:[32]

> **4.1.11.1.   (U) "Criminal Fingerprint" Card (FD-249)**
>
> (U) The FD-249 "Criminal Fingerprint" card is used by criminal justice agencies to record the fingerprint impressions of those persons who have been arrested or incarcerated in penal institutions. A criminal card includes information regarding the arrest charge, the disposition, and other information relating to the physical description of the arrested or incarcerated individual. Space is provided for the UCN, which must be indicated when known. Spaces are also provided for the contributor of the fingerprints to indicate whether a reply is desired. Due to the requirements of CJIS's NGI, when a contributor places a UCN on the fingerprint card, it is also necessary to submit a full set of fingerprints.

Likewise, the FBI's instructions on top of the card itself state that it is to be used for criminal justice purposes, "***such as incidental to arrests and incarcerations.***"[33]



And therein lies the root problem: despite the FD-249's stated purpose, DoD Instruction 5505.11 instructs that fingerprints must be collected on the card merely upon a determination of

[32] **Exhibit D2**, FBI Fingerprint and Latent Fingerprint Identification Policy Guide, § 4.1.11.1, https://vault.fbi.gov/fingerprint-and-latent-fingerprint-identification-policy-guide-0973pg/fingerprint-and-latent-fingerprint-identification-policy-guide-0973pg-part-01-of-01/view (last visited January 7, 2025) (underline added).
[33] **Exhibit D1**, FBI FD-249 Fingerprint Card, p. 2; *see also* FBI Documents, https://www.fbi.gov/file-repository/fd-249.pdf/view (last visited Jan. 9, 2025).

probable cause. As a result, military law enforcement complete the FBI FD-249—including the "Date of Arrest" field—even when no arrest has taken place and absent any charges.[34]

But as the Court is aware, a determination of probable cause leading to an investigation is not the same thing as an arrest or being charged with a crime. Nonetheless, because the FBI considers the FD-249 to be a record of persons "who have been arrested or incarcerated," it accepts the document's contents at face value, thereby producing phantom records of arrests.[35]

This mismatch of instructions, forms, and bureaucratic requirements is why Sgt. Rosales has been branded as having been arrested even though that is not true. Sgt. Pack—following Army policy—entered the date that Sgt. Rosales voluntarily appeared to be fingerprinted.

**E.    The Army Bureaucracy Is Ruining Thousands of Lives and Professional Careers.**

Sgt. Rosales is not alone in her plight. As reported by Stars and Stripes, "thousands of service members" are affected by false criminal records.[36] Indeed, the Army admits that from 2014 to 2023, it submitted 390,737 FD-249 fingerprint cards to the FBI.[37] The Army's policy of using the FBI FD-249 cards as records of fingerprinting rather than arrest makes it possible that tens of thousands of arrest records derived from over 390,000 fingerprint cards are false.

The Army has acknowledged the widespread problem. At a press conference held on November 3, 2022, Gregory Ford, Director of Army Criminal Investigation Division, acknowledged that in the course of reviewing records from the Army's investigation into the Army Guard Recruiting Assistance Program ("G-RAP"), false criminal history reports were created for

---

[34] Pack Dep. at 55:4-11; 68:7-12; *see also* Blanset Dep., 65:15-66:22 (referring to Exhibit 3 of Mr. Blanset's deposition, here marked as **Exhibit C1**, Rosales FBI Record (January 5, 2024)).

[35] *See* **Exhibit A4**, Declaration of Michael A. Christman, ¶ 5 (stating that arrest data is "obtained from fingerprint submissions").

[36] **Exhibit E2**, Rose L. Thayer, "'Proving your innocence': Veterans fight to clear their names for military crimes they did not commit," STARS AND STRIPES (March 4, 2024), https://www.stripes.com/veterans/2024-03-04/military-criminal-records-veterans-troops-expunge-13203822.html, p.2.

[37] **Exhibit E1**, Army Fingerprint Submission Quantities.

the majority of 900 people, with affected servicemembers "inaccurately, inappropriately entered into that III [FBI] system, which reflects an arrest."[38]

As a former Army attorney told Stars and Stripes, "[t]he Defense Department has the power to clear these people's records, but they don't do it and they won't do it."[39] Likewise, Barry Blanset, U.S. Army CJIS Security Officer and Assistant Director for the Criminal Justice Information Directorate, testified in this case that "*We don't change fingerprint cards*[.]"[40] Because servicemembers like Sgt. Rosales have no recourse to fix their problems, she seeks class certification of a proposed class defined herein.

## III.  CLASS DEFINITION

Plaintiff's proposed class consists of: all servicemembers who have served in the United States Army, Army National Guard, and/or Army Reserve who have been fingerprinted using the FBI FD-249 fingerprint card but were not in fact arrested, incarcerated, or charged with a crime (as reflected on the FD-249) during the period between April 26, 2017 through the date of judgment.

## IV.  ARGUMENT

A class action may be maintained if Rule 23(a)'s four requirements (numerosity, commonality, typicality, and adequacy of representation) and at least one of Rule 23(b)'s provisions are sustained. FED. R. CIV. P. 23(a)-(b). Rule 23 is a "categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co*., 559 U.S. 393, 398 (2010). In analyzing whether a class should be certified, "'the question is not whether the plaintiff or plaintiffs have stated a cause

---

[38] **Exhibit E3**, CID Director Ford Media Transcript, pp. 6-8, 15.
[39] **Exhibit E2,** Rose L. Thayer, "'Proving your innocence,' p. 3 (internal quotations omitted).
[40] Blanset Dep., 49:3.

of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268 (S.D. Tex 2005) (internal quotations omitted) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 (1974)). In this case, the proposed class meets all the requirements of Rule 23(a) and Rule 23(b)(2).

## A.    Numerosity.

First, the proposed class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Numerosity's focus is not only on "sheer numbers," but may also account for other considerations, *e.g.*, "the geographical dispersion of the class" and "the nature of the action." *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (citations omitted). In assessing numerosity, the Court may rely on "common sense inferences at the class certification stage." *M.D. v. Perry*, 294 F.R.D. 7, 25 (S.D. Tex. 2013) (internal quotations and citation omitted).

The numerosity requirement is satisfied. Sgt. Pack testified that, in Kuwait alone, he and his fellow Army investigators fingerprinted over 45 people under a policy of putting the fingerprint date in the arrest box.[41] And in 2023 alone, the Army submitted 29,982 FD-249 fingerprint cards to the FBI.[42] If even one percent of those FD-249 cards contain a "Date of Arrest" field populated with dates that servicemembers were merely fingerprinted but *not* arrested, that would mean about 300 servicemembers have criminal histories stored in the FBI's databases that are false.

The numbers only grow from there. If the same percentages of servicemembers who had to be withdrawn from the FBI's records as a result of the G-RAP investigation review were applied to all 390,737 fingerprint cards that the Army submitted to the FBI since 2014, there would be ***252,166 individuals who need their FBI criminal records corrected and 18,730 individuals who***

---

[41] *See* Pack Dep., 28:16-29:5; 68:7-12.
[42] **Exhibit E1**, Army Fingerprint Submission Quantities.

***need their arrest records deleted*** from the FBI's criminal database.[43] Thus, the numerosity requirement is met in this case.

**B.    Commonality.**

Commonality asks whether "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A common question is one that, if answered as to one class member, will advance the resolution of the claims of the other members of the class, *i.e.*, "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id*. at 359 (quotation marks and alteration omitted). Nor does commonality require that common questions be answered at the certification stage; the plaintiff need only supply evidence showing that a particular contention is *common*, "but not that it is correct." *See In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

Common questions surrounding the same challenged conduct—*why* Defendants knowingly misuse the FD-249 card to indicate arrests that never occurred, and *why* Defendants refuse to correct erroneous records—form the core of the inquiry on this front. *See, e.g.*, *Cain v. City of New Orleans*, 327 F.R.D. 111, 125 (E.D. La. 2018) ("All putative class members face the same threat of injury because of the Judges' unconstitutional policy or practice. This is enough to establish commonality…"). As this Court noted early in this case,"[w]hat is a little aggravating is we don't really have an explanation from the Army as to why they haven't changed her record to

---

[43] *See id.; see also* **Exhibit E4**, Review of Titling and Indexing Practices of the Army and Certain Other Organizations (April 2023), p. 4 of .pdf (showing that, of 2,253 Army investigations where G-RAP participants had their names submitted to the FBI to create arrest records, 1,454 individuals required corrective action; and of those 1,454, only 108 remained indexed at the FBI).

remove that charged part of it. Because apparently she wasn't charged. I mean, I don't understand why they don't just remove it."[44]

Additional common questions of law and fact include, but are not limited to:

(a) Whether Defendants have a policy or practice of using the date a servicemember was merely fingerprinted, or the date that another non-arrest event occurred, to populate the "Date of Arrest" field, despite the FBI's explicit instructions.

(b) Whether Defendants provide any form of notice to servicemembers that the date of their fingerprinting will be used as the "Date of Arrest" on the FD-249 fingerprint card, or that the FBI will use the "Date of Arrest" to create a record of an arrest even when none occurred.

(c) Whether Defendants have implemented any procedural safeguards to protect servicemembers against transmission of false data to the FBI via the FD-249 fingerprint card.

(d) Whether Defendants provide a constitutionally adequate process for servicemembers to review, amend, or correct a fingerprint card used to create false FBI arrest records.

(e) Whether Defendants have a policy or practice of refusing or denying amendment requests under the Privacy Act by asserting exemptions.

(f) Whether Defendants' policies, lack of notice, lack of safeguards, and lack of an opportunity to seek relief violate class members' right to procedural due process under the Fifth Amendment.

Answers to these questions will necessarily resolve Sgt. Rosales's individual due process claim and the due process claims of absent class members. These common questions—and

---

[44] **Exhibit F2**, Transcript from Hearing on Defendants' Motion to Dismiss, 37:6-10.

others—are capable of resolution on an aggregate basis because Defendants' conduct vis-à-vis Sgt. Rosales is not the product of some rogue actor defying Army directives. Rather, Defendants' conduct is governed by a uniform set of policies and procedures, *e.g.*, DoD Instruction 5505.11, which states that *every* fingerprint card must be sent to the FBI,[45] and the FBI's own documents show that *all* these fingerprint cards are treated as records of arrest.[46] Along those lines, how servicemembers' records are subsequently disseminated, and their use, is dictated by statute and corresponding agency regulations.[47]

## C.    Typicality.

Typicality examines whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997). "When determining whether typicality is satisfied, 'the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class.'" *Hackler v. Tolteca Enterprises, Inc.*, SA-18-CV-911-XR, 2019 WL 7759523, at *4 (W.D. Tex. Sept. 9, 2019) (citation omitted).

Sgt. Rosales's claims are typical of the proposed class for the same reasons described above—her circumstances are the product of uniform policies such as DoD Instruction 5505.11's command that the Army submit a FBI FD-249 fingerprint card whenever "probable cause" has been determined even if no arrest has occurred. Thus, if "the class members in this case were to

---

[45] *See* **Exhibit D4**, DoD Instruction 5505.11, § 1.2.b.
[46] **Exhibit D2**, FBI Fingerprint and Latent Fingerprint Identification Policy Guide, § 4.1.11.1.
[47] For example, 28 C.F.R. §§ 20.33 and 50.12 explain that the FBI further distributes arrest records to: state and federal criminal justice agencies, noncriminal justice agencies performing functions for criminal justice agencies, federal agencies, state and local governments, organizations in connection with licensing or employment, private government contractors pursuant to specific agency agreements, federally chartered or insured banking institutions, and certain segments of the securities industry, among others.

proceed in a parallel action, they would advance legal and remedial theories similar, if not identical, to those advanced by the named plaintiff[]." *Lightbourn*, 118 F.3d at 426.

## D.    Adequacy.

The adequacy inquiry asks whether the representative party will "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "[A] court must consider whether a class representative has an interest materially adverse to some of the class and whether she is properly qualified to assume the role of class representative." *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 424 F. Supp. 3d 456, 483 (E.D. La. 2020).

Sgt. Rosales is an adequate representative. Like all members of the proposed class, Sgt. Rosales has a false criminal record and suffered adverse effects due to that false record. And because she seeks relief that will benefit all servicemembers—*e.g.*, correction of those false records—Sgt. Rosales has no conceivable conflict of interest with the class.[48] Moreover, Sgt. Rosales has actively kept herself up to date with the proceedings of the case and participated in the discovery process.[49]

## E.    Class Counsel.

Rule 23(g) provides that a "court that certifies a class must appoint class counsel" who satisfies specified criteria, all of which are met. FED. R. CIV. P. 23(g)(1).

First, the work counsel has done in identifying or investigating potential claims in the action has been extensive, as reflected in the detailed complaint, opposing Defendants' motions to dismiss, their engagement in written discovery and deposing multiple fact witnesses, and filing the instant motion. *See* FED. R. CIV. P. 23(g)(1)(A).

---

[48] *See generally* Rosales Dec.
[49] *See id.* ¶¶ 12-16.

Second, as reflected in the Declaration of Richard Hood, class counsel have experience in "handling class actions, other complex litigation, and the types of claims asserted in the action." FED. R. CIV. P. 23(g)(1)(A)(ii). For example, William Thomas and William King of McDowell Hetherington LLP have represented parties in litigation spanning class actions, complex business disputes, and constitutional litigation and are knowledgeable of the procedures and substantive law applicable here.[50] And Doug O'Connell of O'Connell West, PLLC, represented Sgt. Rosales prior to this lawsuit through her request for record amendment in accordance with the Privacy Act. He has also represented hundreds of soldiers and veterans under investigation by Army Criminal Investigation Division who often discover that they have false arrest records.[51]

Last, proposed class counsel have and will continue to devote extensive time and resources to the matter at hand, together supporting Sgt. Rosales and the class with the litigation infrastructure necessary to support claims herein.[52] FED. R. CIV. P. 23(g)(1)(A)(iv).

**F.    Certification is Appropriate Under Rule 23(b)(2).**

Certification of a class pursuant to Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds that apply *generally* to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2) (emphasis added). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

---

[50] *See generally* **Exhibit A7**, Declaration of Richard Hood.
[51] **Exhibit A5,** Declaration of Doug O'Connell.
[52] *See* **Exhibit A7**, Declaration of Richard Hood, ¶ 14.

Rule 23(b)(2) is satisfied because Defendants' conduct is "generally applicable to the class as a whole" and because "injunctive relief predominates over monetary relief." *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010) (citation omitted).

### 1.    Defendants' conduct is applicable to the class as a whole.

A central policy is sufficient to show a pattern or practice applied to a whole class. *See Casa Orlando Apartments*, 624 F.3d at 198. The Defendants' policies and procedures described above comprise behavior applicable to the class as a whole. This is the necessary result of the Defendants' uniform implementation of DoD Instruction 5505.11 and Army Regulation 190-45, which implements DoD Instruction 5505.11 across the Army.[53] The net result is that the Army has a *de facto*, if not categorical, policy of falsely populating the "Date of Arrest" field in the FBI FD-249 card with a fingerprinting date rather than an arrest date.[54]

Defendants have refused to bring their policies and conduct into compliance with due process guarantees. Neither the DoD nor the Army provide any type of safeguards to prevent the mass creation and dissemination of false records, nor have they indicated any interest in providing procedures to correct the information. As Mr. Blanset said, "We don't change fingerprint cards[.]"[55] Defendants' categorical refusal to provide relief should come as no surprise; misusing the FD-249's "Date of Arrest" field despite the consequences is technically correct in the eyes of the Army in light of DoD Instruction 5505.11, which effectively requires that Army law enforcement personnel enter information that means 'X' into a box for information that is intended solely for 'Y'.

---

[53] *See supra* notes 29 & **Exhibit D4**, DoD Instruction 5505.11, p. 1.
[54] Pack Dep., 60:5-6, 8-23.
[55] Blanset Dep., 49:3.

2.      **Injunctive and declaratory relief predominate.**

Among other things, Sgt. Rosales seeks relief in the form of declarations that Defendants' constitutionally deficient protocols and policies violate due process. She also seeks injunctive relief requiring that Defendants end their practice of submitting false arrest records to the FBI, and provide the class with a mechanism to challenge the erroneous information stored in government databases.[56] The scope and aim of the requested non-monetary relief aligns with the purpose of Rule 23(b)(2) and will provide relief to each member of the class.

## V.  CONCLUSION

The nature of the Defendants' behavior applies across the whole class, and the relief sought by Plaintiff likewise applies to all class members equally. By systematically generating false records of arrest and refusing to correct them, the Army has denied all class members the ability to fully participate in society without having their character impugned by a false criminal history. For the foregoing reasons, Plaintiff Denise Rosales asks the Court to grant this motion, certify the proposed class, appoint the undersigned as class counsel, and to grant any further relief to which she may be justly entitled.

*[signature block on next page]*

---

[56] *See* ECF No. 42, Plaintiff's Third Amended Complaint, pp. 13-14, 20.

Dated: January 9, 2025

Respectfully submitted,

O'CONNELL WEST, PLLC

By: */s/ Douglas K. O'Connell*
**Douglas K. O'Connell**
Texas State Bar No. 00792028
505 West 12th Street, Suite 200
Austin, TX 78701
Telephone: (512) 547-7265
doug@oconnellwest.com

MCDOWELL HETHERINGTON LLP

By:  */s/ William B. Thomas*
**William B. Thomas**
Texas State Bar No. 24083965
**William X. King**
Texas State Bar No. 24027496
**Richard R. Hood**
Texas State Bar No. 24124181
1001 Fannin, Suite 2400
Houston, Texas 77002
Telephone:  713-337-5580
Facsimile:   713-337-8850
Email: William.Thomas@mhllp.com
          William.King@mhllp.com
          Richard.Hood@mhllp.com

***Attorneys for Denise A. Rosales***

## **CERTIFICATE OF CONFERENCE**

Pursuant to L.R. CV-7(g), counsel for Plaintiff conferred with counsel for Defendants on January 7 and 8, 2025 via email about the relief sought. Defendants oppose the relief sought and will not stipulate to class certification.

*/s/ William B. Thomas*
William B. Thomas

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure via email and/or filing through the Court's ECF System on January 9, 2025.

<u>*/s/ William B. Thomas*</u>
William B. Thomas